THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOHN W. DAVIS *et al.* Plaintiffs in Error.

*Opinion filed June 22, 1927.*

1. CRIMINAL LAW—*when subsequent conversion of property constitutes larceny.* Where the owner of personal property parts with its possession but retains the title, intending that the property shall be returned to him or disposed of in a particular manner agreed upon, the subsequent felonious conversion of the property by the party in possession will relate back and make the taking and conversion larceny.

2. SAME—*when instruction as to effect of recent possession of stolen property should not be given.* Where the defendants in a prosecution for the larceny of hogs admit having taken the hogs but claim that they were found drowned, and that the owner had agreed that if they were found in that condition the defendants should do the best they could with the meat and he would settle

with them, instructions stating that the recent possession of stolen property, if unexplained, raises an inference of the guilt of the possessors should not be given, as the issue is not in regard to the taking of the property, which is admitted, but as to the subsequent conversion, and the characterization of the property as stolen assumes that a larceny was committed and is prejudicial.

WRIT OF ERROR to the Circuit Court of Gallatin county; the Hon. C. H. MILLER, Judge, presiding.

MARSH WISEHEART, (WILLIAM DENTON, of counsel,) for plaintiffs in error.

OSCAR E. CARLSTROM, Attorney General, JOSEPH L. BARTLEY, State's Attorney, and VIRGIL L. BLANDING, for the People.

Mr. JUSTICE DUNN delivered the opinion of the court:

John W. Davis and John L. Davis, his son, were indicted in the circuit court of Gallatin county, jointly with Bert Brazier, John Young and George McClelland, for the larceny of nine hogs, of the value of $135. They were tried together and the two Davises were found guilty, the other defendants being found not guilty. This writ of error is prosecuted to reverse the judgment of conviction.

The facts appearing from the evidence are, that Ernest Ralph, the owner of the hogs, about Christmas, 1925, turned them out to feed in the Ohio river bottoms. Two or three weeks later he looked for the hogs but could not find them. He stayed two nights at John W. Davis' house, where John L. Davis was living with his family, and the latter agreed to help him find the hogs. They took a boat and went to several ridges which were out of water but did not find them. They went over the ridges in all the bottoms except Jack ridge, which they could not reach on account of the water, and Ralph went home the next day. Ralph met John L. Davis in town and told him that he would give him the best hog in the bunch if Davis would find them, but

they were not found and Ralph heard nothing about them until some time later. Early in February he received a message over the telephone on Sunday that the hogs were found, and went down on Monday morning and found the hogs at Davis'. He called the Davises over the telephone, but his conversation was not with either of them. He went to John W. Davis' place and talked with John L. Davis about the hogs. The latter told him he would find the hogs and would go with Ralph and show him where they were. Ralph talked a little while and then went off, as if he were going to Robert Mitchell's. Albert Richerson, who had been over the bottoms looking for his own hogs, found under a pile of cobs on Powell mound the fresh hides of eight hogs, and Charles Wallace and John Logsdon found the hide of a ninth hog near by. Ralph went to the place where these hides were, and identified them as the hides of his hogs by means of a small round hole in the right ear, by which he had marked them. He then returned and met John L. Davis, whom he told that he was looking for his hogs, and Davis said he could tell him where the hogs were; that they were in the smoke-house. He said that his father, George Young and Bert Brazier had found them dead but Ralph could have his part of them. Ralph said that if they were drowned he did not want them and asked Davis to go over on the river with him, but he did not go. Ralph then got Jim Mitchell and went to the home of John W. Davis. Ralph told Davis that John L. Davis said he had found Ralph's hogs. Davis answered, "Sure; get down and come in;" and they went to the smoke-house together and found the meat of all the nine hogs except two ribs and one backbone. Davis told Ralph he could have the meat if he wanted it, but Ralph and Mitchell went to town and got the deputy sheriff to go down and get it. At Davis' house Ralph asked him what he was going to do with it, and Davis said he was going to make meat out of it. Ralph told him that he did not know whether it would be

good or not, and Davis told him that they used to dry meat in the old days, and Ralph said, "You go ahead, and if you can do any good with it we will go fifty-fifty." The hams and shoulders were salted down, looked fresh and were not spoiled. When Ralph got it he ate about half of it and sold about one hundred and fifty pounds to his brother. Other witnesses testified that the hides which were found at the cob pile looked fresh, and that there was a small hole about the size of a lead pencil just below the butt of the ear of each, about the size of a .38 bullet, and there were some pieces of hide lying there and some blood and entrails.

John L. Davis testified that he went with Ralph to the bottoms to help find his hogs and they hunted two days but did not find them; that Ralph said he understood they were on Jack ridge and asked Davis to show him where Jack ridge was. The weather was cold and they found nothing there. Ralph stayed all night, and the next morning they went again but could not get across the water on their horses. They got a boat, broke the ice and got on a ridge, looked over on Jack ridge and saw it was covered with water. They then returned home. Ralph told Davis if he found the hogs frozen in the ice to take care of them and Ralph would pay him for it; that the meat under those conditions would be good to eat; that if he found them alive he would give him the best one in the bunch. The water was rising at that time. After it had fallen some Davis swam a horse across the slough and found nine hogs drowned. He knew they were Ralph's hogs. He returned home, got a wagon and boat and also his father, George McClelland, George Young and Bert Brazier. They put the hogs in the boat and took them to the mound. It was very cold that day. They skinned them and took them to the smoke-house. They tried to call Ralph but could not. They talked to Rose Williams and told her to tell Ralph they had found his hogs, and Ralph came down the following Monday. He found the hogs on Thursday. He was

by himself when he found them. They skinned the hogs the next morning. The hides were left on top of the cob pile and were not covered up. He never saw any holes back of their ears.

John W. Davis testified that his son, John, and Ralph, started out on January 25 to hunt the hogs. They came back that night and stayed all night; that the next morning John and Ralph went across the water and stayed all day, coming in about four o'clock wet and cold; that Ralph said to John: "I believe my hogs are drowned and I am going home and I will leave it to you, and if you find them alive I will give you one of the best hogs in the bunch; if you find them drowned, do the best you can and I will treat you right; I know the meat is all right because I have eat meat that was drowned." The two Davises found the hogs on Jack ridge and took them to Powell mound and skinned them. They were dead when they found them. They knew they were Ralph's hogs. After the hogs were skinned they took them to John W. Davis' house, hung them in the smoke-house and let them drain over night. They were full of ice water. John W. Davis tried to get Ralph that night over the telephone but could not. He got Mrs. Williams and had her relay the message. Ralph came down early Monday morning and John W. Davis showed him the hams. He telephoned in ten minutes after they got the hogs in the smoke-house that Saturday evening.

The brief and argument of the plaintiffs in error is devoted entirely to the instructions to the jury. The defense of the three defendants Brazier, Young and McClelland was that they had no intention of stealing the hogs, and what they did was merely to assist the other two defendants to skin the hogs and take care of them for the owner, under the belief that John W. and John L. Davis were authorized by the owner of the hogs to take care of them and had an agreement with him for that purpose. At their request the court instructed the jury in instructions 10

and 11, in substance, that if the jury believed from the evidence that the other three defendants went with John W. and John L. Davis to where the hogs were but had nothing to do with them except to help John W. and John L. Davis to take the hogs to the house of John W. Davis and received no part of the hogs and converted no part of them to their own use, but that John W. and John L. Davis claimed that they had made an agreement with the owner of the hogs to care for them for the owner, and the three other defendants, believing that John W. and John L. Davis had such an agreement with the owner, went with them only for the purpose of caring for the hogs and with no intention of stealing them, then the jury should find Brazier, Young and McClelland not guilty. These instructions applied to the facts supposed the rule of law that there can be no crime of larceny without an intention to steal, and if these three defendants believed in good faith that they were assisting the other two defendants to take care of these hogs for the benefit of the owner in accordance with an agreement with him, they could not be guilty of larceny. They had the right to have the jury instructed as to the law applicable to their defense. The instructions contained no assumption that the plaintiffs in error were guilty, and therefore they have no reason to complain of their being given to the jury.

Objection is made to the giving of instruction 15 on the subject of reasonable doubt. The instruction is the same as instruction 13 in *Spies* v. *People,* 122 Ill. 1, omitting the last two sentences. It was approved in that case in its entirety, and the omission of the last two sentences removes the criticism made in that case.

Instructions 14 and 16 are as follows:

14. "The exclusive possession, shortly after the commission of a larceny, robbery, or burglary, of stolen property, the proceeds of the crime, if unexplained, may of itself raise an inference of guilt of the person having such possession,

sufficient to authorize a conviction in the absence of any other evidence of facts and circumstances in evidence which leave in the minds of the jury a reasonable doubt as to the guilt of such person."

16. "The court instructs the jury that the possession of stolen property soon after a theft is evidence that the person in whose possession the stolen property is found has committed the larceny unless the evidence shows the person in whose possession the property is found may have come into the possession of the property lawfully."

These instructions state abstract propositions of law which have no application to the facts in this case. There was no issue in this case in regard to the persons who committed the larceny, if any larceny was committed. The plaintiffs in error did not deny their possession of the property or the manner of its acquisition. They found the hogs and took possession of them. If these facts and the circumstances of their occurrence were such as to constitute the crime of larceny plaintiffs in error are the persons who committed the crime. If they were not such as to constitute the crime of larceny their possession of the property was no evidence of their guilt of any crime. The instructions assume that larceny was committed and that the possession of the goods stolen was evidence that plaintiffs in error committed the crime. If the hogs were alive when found by the plaintiffs in error and were killed by them and appropriated to their own use they were clearly guilty of larceny. If the hogs were drowned when they were found and the defendants took possession of them under an agreement with the owner that they should do the best they could with them and he would pay them, then such taking possession did not amount to larceny, but if they afterward converted the hogs to their own use with the intent of depriving the owner of them, then the taking and conversion would constitute larceny. (*People* v. *Csontos,* 275 Ill. 402.) If the owner of personal property parts with its possession,

retaining the title and intending that the property shall be returned to him or disposed of in some particular manner which is agreed upon, in such case the subsequent felonious conversion of the property will relate back and make the taking and conversion larceny. *Aldrich* v. *People,* 224 Ill. 622.

The material issues in the case were whether the hogs were alive when found and were killed by the plaintiffs in error, or were dead when found and were taken by the plaintiffs in error and converted to their own use with the intention of depriving the owner of them. The evidence on these issues was contradictory but there was no dispute that the plaintiffs in error took the hogs, and the question was not who took them or was responsible for the acts, but was whether the acts proved constituted larceny. The instructions, by stating abstract propositions of law not applicable to the facts shown, had a tendency to distract the attention of the jury from the real question whether any larceny was committed, and to lead them to believe that the possession of the hogs by the plaintiffs in error, regardless of the manner in which that possession arose, was evidence that the defendants were guilty of larceny. If the hogs were stolen the plaintiffs in error stole them, and the only question in the case was whether the taking of the hogs under the circumstances shown by the evidence was larceny. The characterization of the hogs by the court as stolen property amounted, under the circumstances of this case, to an assumption that a larceny had been committed; and it was prejudicial error to give these instructions.

For the above error the judgment is reversed and the cause remanded.                    *Reversed and remanded.*